IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INDIANA SUGARS, INC. and<br>NEW YORK SUGARS, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>PROCESS ENGINEERING SYSTEMS,<br>INC.,<br><br>*Defendant*. | No. 20 C 3908<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION & ORDER

Indiana Sugars and New York Sugars ("Plaintiffs") manufacture and distribute sugar products. Plaintiffs contracted with Process Engineering Systems ("PES") starting in 2018 for their assistance with installing a sugar unloading system at one of Plaintiffs' facilities in Rochester, New York. (*E.g.*, Dkt. 48-1 ¶ 9). Despite PES's alleged representations that the system would be able to convey 30,000 pounds per hour, Plaintiffs claim that it has never managed to achieve that result. (Dkt. 1 ¶ 1). As a result, Plaintiffs brought this action alleging negligence and breach of contract. (Dkt. 1 at 12–14). Plaintiffs now move for summary judgment on Defendant's First and Third Affirmative Defenses. (Dkt. 32). Defendant filed a cross-motion for summary judgment on its First Affirmative Defense. (Dkt. 38). For the reasons set forth below, Plaintiffs' Motion for Summary Judgment [32] is granted, and Defendant's Motion for Summary Judgment [38] is denied. In addition, Defendant's Motion to Strike and for Leave to File Amended Affidavit [48] is granted in part and denied in part.

1

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiffs manufacture and distribute sugar products, typically for use as food ingredients. (Dkt. 40 ¶ 1). Plaintiffs process bulk sugar into finished sugar products, and sell those products to food manufacturers and other customers. (*Id.* ¶ 2). Defendant PES provides systems integration services and project solutions for bulk material-handling systems. (Dkt. 31-2 ¶ 12; Dkt. 31-4 at 21:8–9). Robert Milligan is the President and founding Principal of PES. (Dkt. 48-1 ¶ 2). Milligan had a license to practice Professional Engineering (or "P.E.") from 1995 to 2005, at which point he declined to renew the license. (*Id.* ¶¶ 6–7). However, he has since continued to incorporate the "P.E." honorific in his signature line on his business email account. (*See, e.g.*, Dkt. 40-2 at 126:2–129:22).

PES has represented itself as a "materials-handling expert" with "superior design capabilities" and "a proven, highly reliable process." (Dkt. 31-2 ¶ 12; *see also* Dkt. 31-4 at 21:8–9). In addition, PES's website made the following representations about its services:

- "Partnering with [PES] means you will tap into a wealth of expertise in . . . Experienced Engineering Design and Controls. . . . [PES's] reputation as materials-handling experts is built on a solid foundation." (Dkt. 31-4, Ex. 1 at 39).
- "Our engineers complete a comprehensive study of your current processes, your requirements and your desired outcomes before they begin working on a solution that is 'tailor-made' for your unique environment." (*Id.* at 40; *see also* Dkt. 40-2 at 16:14–23).
- "With a thorough understanding of your environment and requirements, our specialized engineering staff begins to work on the design of your system." (Dkt. 31-4, Ex. 1 at 40; *see also* Dkt. 40-2 at 17:5–11).
- "Our seasoned construction personnel oversee every aspect of the installation and assembly of your project. In their capable hands you can feel confident that the installation will proceed efficiently and safely." (Dkt. 31-4, Ex. 1 at 40).

Notwithstanding the foregoing, Milligan maintains that none of the services provided by PES "require professional licensure," for example in the field of engineering. (Dkt. 48-1 ¶¶ 4, 7). In his deposition, Milligan clarified that PES itself is not an engineering firm but hires subcontractors

to provide engineering services. (*E.g.*, Dkt. 31-4 at 16:24–17:3, 21:8–9 ("We're systems integrators and we specialize through our sub[contractor]s with material handling."); Dkt. 44-1 at 58:22–59:10 (referencing that PES charges clients for the engineering provided by its subcontractors)). That said, Milligan conceded that PES "suppl[ies]" engineering to its customers – albeit through its subcontractors. (Dkt. 44-1 at 60:16–61:8 (Milligan adding that he "take[s] responsibility for [his] sub[contractor]s")).

In 2018, INSU initiated plans to operate a new sugar manufacturing line in Rochester, New York (the "Rochester Project") and formed NYSU to be the operating entity at that location. (Dkt. 40 ¶ 8). Plaintiffs engaged PES to design and construct this processing facility, specifying that the facility must be capable of producing liquefied and bulk sugar with a material conveying rate of 30,000 pounds per hour. (*Id.* ¶ 5; *see also* Dkt. 48-1 ¶ 9 (Milligan explaining that PES agreed to "provide design/build services for the installation of a sugar unloading system . . . at [Plaintiffs'] sugar processing facility" in Rochester)). INSU's then-Vice President of Special Products John Tritt initially served as INSU's primary point of contact for PES regarding the Rochester Project. (Dkt. 44 ¶ 3). In January 2019, Joseph Huss assumed Tritt's role as the primary point of contact for PES. (*Id.* ¶ 4).

Between August 29, 2018 and April 12, 2019, the parties entered into nine valid and enforceable agreements through which Plaintiffs agreed to purchase goods and services from PES.[1] (*Id.* ¶ 5; *see also* Dkt. 48-1 at 44, 52, 63, 77, 100, 114, 128, 141, 152). Execution of these agreements generally proceeded as follows. First, PES issued Plaintiffs a quotation that proposed an itemized list of goods and services for sale (the "Quotations"). Each Quotation contained

---

[1] PES appears to argue that the parties entered into *one* contract "which was memorialized in a series of Purchase Orders and Quotations." (Dkt. 44 ¶ 1). Plaintiffs counter that each of its purchase orders "constituted a separate contract, independent of the other Purchase Orders," and thus the parties entered into more than just one integrated agreement. (*Id.*; Dkt. 40 ¶ 16).

3

introductory language summarizing the goods and services offered therein. For example, PES's Quotation issued on November 16, 2018 began: "[PES] proposes to furnish the following engineering, design, equipment [and] controls for the [Project]." (Dkt. 48-1 at 116 (cleaned up)). The Quotations then set forth products and services being offered to Plaintiffs, detailing equipment specifications and prices. (*E.g.*, *id.* at 116–23 (listing for purchase, among other things, an incline screw conveyor to build a sugar silo)). Each of the Quotations also has a subsection of costs designated for "Engineering and Project Management Services." (*E.g.*, *id.* at 120). As an example, the Engineering and Project Management Services offered in the November 16 Quotation included: equipment design, a "final engineered drawing package," overall project management, and "final engineering and final design." (*Id.* (cleaned up); *see also* Dkt. 40-2 at 71:3–5 (Milligan clarifying that a PES subcontractor would provide the "final engineering and design" services, and that PES collaborated with subcontractors on the "final engineering drawing package" by working on equipment layouts)). Each Quotation was subject to a uniform list of terms and conditions. (*E.g.*, Dkt. 48-1 at 49–51). These included a warranty provision (the "Warranty"), which stated:

> All equipment is of high quality and is manufactured in conformity with the best commercial practices in the various lines. <u>We guarantee all equipment manufactured to be free from defects</u> in material and manufacture at the time of shipment for a period of one (1) year from date of shipment. <u>We will furnish and install without charge, replacements for such parts</u> as we find to have been defective.
>
> This guarantee shall not apply to any equipment which has been subjected to misuse, neglect or accident, or has been altered or tampered with, or if corrective work has been done thereon without our specific written consent.

(*Id.* (emphasis added)). The Quotations also included a Limitation of Liability Clause ("LOL Clause") immediately following the Warranty, which provided:

> It is expressly understood that <u>our liability for our products is limited to the furnishing of such replacement parts</u>, and that we will not be liable for any other expense, injury, loss or damage, whether direct or consequential including but not

4

>limited to loss of profits, production, increased cost of operation, or spoilage of material arising in connection with the sale or use of, or inability to use, our equipment or products for any purpose except as herein provided.

(*Id.* (emphasis added)).

For seven of the nine Quotations issued by PES, Plaintiffs communicated their acceptance through written purchase orders ("Purchase Orders") issued by Tritt or Huss.[2] (Dkt. 44 ¶ 5). The Purchase Orders contained a summary description of the goods and services Plaintiffs sought, noted the total amount due to PES, and set performance deadlines for PES. For example, Plaintiffs issued a Purchase Order on December 11, 2018 in response to the November 16 Quotation. (*See* Dkt. 48-1 at 114). The December 11 Purchase Order set forth: "[PES] is to furnish the following engineering, design, equipment, and controls for the [Project] including all parts, installations[,] and services as outlined in [the] Quotation . . . dated November 16, 2018." (*Id.* (cleaned up)). It further stated that the "total cost [of the ten items in] this quotation" was $51,650 but did not delineate what those items were or their individual prices. (*Id.* (cleaned up)). The Purchase Orders were also each subject to terms and conditions provided by Plaintiffs. (*E.g.*, *id.* at 115). Plaintiffs concede that the Purchase Orders further incorporated "certain terms and conditions from PES's Quotations," but maintain that Plaintiffs did not accept PES's Quotations in their entirety. (Dkt. 44 ¶¶ 7–8). In contrast to the foregoing offer and acceptance procedure, there were two times that Plaintiffs approved PES's Quotations *without* delivering written Purchase Orders. (*Id.* ¶ 9; *compare* Dkt. 48-1 at 114 (written Purchase Order responding to November 16 Quotation), *with*

---

[2] On two occasions, Plaintiff's Account Manager, Shannon Orlyk, transmitted fully executed copies of Plaintiffs' Purchase Orders directly to Milligan. (Dkt. 44 ¶ 8; Dkt. 48-1 at 6 (showing Orlyk's email forwarding the October 22, 2018 Purchase Order), 30 (same regarding January 21, 2019 Purchase Order)). Orlyk's emails included the Quotations (including PES's terms and conditions of sale) corresponding to each Purchase Order. (*See* Dkt. 48-1 at 6–29, 30–42).

5

*id.* at 141 (indicating acceptance of April 12, 2019 Quotation without an accompanying Purchase Order), 152 (same regarding March 20, 2019 Quotation)).

Plaintiffs' Complaint alleges that PES engaged in professional negligence and breached its contractual obligation to design and construct a sugar processing facility with a conveying rate of 30,000 pounds per hour. (Dkt. 40 ¶ 5; *see generally* Dkt. 1). PES's Answer asserts several affirmative defenses, only two of which are relevant to the present motions for summary judgment. PES's First Affirmative Defense argues that the parties' agreements "contain[] limitations on recovery, which bar Plaintiffs from recovering any . . . 'expense, injury, loss or damage, whether direct or consequential' other than costs of replacement parts." (Dkt. 40 ¶ 6). PES's Third Affirmative Defense argues that Plaintiffs' professional negligence claim "is barred by the economic loss doctrine, and . . . duplicative of the relief requested" under Plaintiffs' breach of contract claim. (*Id.* ¶ 7).

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). Summary judgment "requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but

6

not speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). *See also Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (internal citations omitted).

## DISCUSSION

### A. Motion to Strike and For Leave to File Amended Affidavit

PES moves to strike certain portions of Plaintiffs' response to its Rule 56.1 Statement of Additional Facts. (*Compare* Dkt. 44 (providing Plaintiffs' challenges to PES's statement of undisputed facts), *with* Dkt. 48 at 4–5 (moving to strike Plaintiffs' responses to paragraphs 4, 5, 7, 8, and 13)). PES's Motion to Strike [48] is denied as moot. Even accepting the facts at issue as true, they do not impact the following analysis of PES's affirmative defenses.

PES simultaneously moves for leave to file an amended version of Milligan's affidavit. (Dkt. 48 at 2–4). Milligan's amended affidavit makes a minor correction to the record by supplying the correct version of an exhibit referenced in Defendant's initial filing. The Court grants Defendant's motion for leave to file the amended affidavit [48].

### B. First Affirmative Defense

The parties filed cross motions for summary judgement on PES's First Affirmative Defense, which contends that the Quotations' LOL Clause bars recovery in this action. (Dkt. 9 ¶¶ 12–14; Dkt. 39 at 6–11). Plaintiffs initially argue that there was no mutual assent with respect to the LOL Clauses. (Dkt. 33 at 7–10). They maintain that the Purchase Orders were not mirror images of the Quotations as they added new terms and conditions; did not incorporate the LOL Clause; and ultimately functioned as counteroffers which PES accepted through performance. (*Id.*

7

at 10). PES counters that Plaintiffs' Purchase Orders "fully incorporated" the Quotations – including the LOL Clause set forth therein – "by explicit reference and by attaching the Quotations to the corresponding Purchase Orders." (Dkt. 39 at 6). PES also emphasizes the fact that Orlyk transmitted executed copies of the Purchase Orders that physically integrated the LOL Clause, (*see* Dkt. 48-1 at 6–29 (October 22, 2018 Purchase Order), 30–42 (January 21, 2019 Purchase Order)), and that Plaintiffs accepted the final two Quotations without modification and without issuing Purchase Orders, (*see id.* at 141–51 (April 12, 2019 Quotation accepted by Plaintiffs as is), 152–69 (same regarding March 20, 2019 Quotation)).

However, even if the LOL Clause applies to the contracts at issue, it does not bar recovery in this case. New York law[3] "frowns upon contracts intended to exculpate a party from the consequences of his own negligence." *Kalinkina v. Martino Cartier Enters., LLC*, No. 16-cv-8331 (RWS), 2017 WL 2670751, at *3 (S.D.N.Y. June 20, 2017) (citing *Gross v. Sweet*, 49 N.Y.2d 102, 106 (1979)). Thus, limitation of liability clauses are strictly construed against the drafter. *ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 100 (2d Cir. 2007) (citing *Uribe v. Merchs. Bank of N.Y.*, 91 N.Y.2d 336, 341 (1998)); *Kalinkina*, 2017 WL 2670751, at *3; *Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F. Supp. 2d 353, 359 (N.D.N.Y. 2001). Such clauses purporting to exempt a party for the consequences of its own negligence must state so clearly, in unambiguous, understandable terms. *Kalinkina*, 2017 WL 2670751, at *3 (citing *Gross*, 49 N.Y.2d at 106); *Walker v. Young Life Saranac Vill.*, No. 8:10-cv-1578 (GTS/CFH), 2012 WL 5880682, at *8 (N.D.N.Y. Nov. 21, 2012); *Barone v. Luongo*, No. 06-cv-3675 (CPS)(MDG), 2007 WL 2693861, at *5 (E.D.N.Y. Sept. 12, 2007); *Anunziatta*, 180 F. Supp. 2d at 359; *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 352 (2020) (explaining that "contractual exculpatory clauses

---

[3] The parties agree that New York law governs this dispute. (*See* Dkt. 33 at 7 n.1; Dkt. 39 at 4).

8

intended to insulate a party from liability" must be written "clear[ly] and unequivocal[ly]"). In addition, when interpreting an unambiguous contract, "the court is to consider its '[p]articular words' not in isolation 'but in light of the obligation as a whole and the intention of the parties manifested thereby.' " *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 333 (S.D.N.Y. 2012) (citing *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009)).

First, the Warranty guarantees "all <u>equipment</u> manufactured [by PES] to be free from defects." (Dkt. 48-1 at 28 (emphasis added)). The Warranty continues that PES will furnish and install "replacements for <u>such parts</u> as [PES] find[s] to have been defective" with exceptions for "<u>equipment</u> which has been subjected to misuse, neglect, or accident" among other things. (*Id.* (emphasis added)). Next, the LOL Clause sets forth that PES's "liability for [its] <u>products</u> is limited to the furnishing of <u>such replacement parts</u>" – apparently referring to the Warranty terms. (*E.g.*, *id.* (emphasis added)). The LOL Clause further provides that PES shall not be liable for harm "arising in connection with the sale or use of, or inability to use, [PES's] <u>equipment</u> or <u>products</u> for any purpose except as herein provided." (*Id.* (emphasis added)). Particularly when read in context, the LOL Clause unambiguously refers to goods supplied by PES for the Rochester Project. It emphasizes that Plaintiffs' remedies are limited to PES's delivery of replacement parts as provided for in the Warranty. Therefore, the plain language of the exculpatory clause is inapplicable to the present dispute – which concerns allegedly deficient <u>services</u> provided by PES. (*See* Dkt. 1 ¶ 1 ("Plaintiffs file this action to recover damages for the negligent design, engineering and construction services that PES provided."); Dkt. 43 at 8).

PES argues that the ordinary meaning of the word "product" includes "services," and therefore the LOL Clause bars Plaintiffs' claim. (Dkt. 49 at 6). Defendant cites no case law interpreting the word in this way. Instead, PES refers to Merriam-Webster's definition of the term

9

"product" which provides: "something (such as a service) that is marketed or sold as a commodity." (*Id.*). This argument is untenable for several reasons. First, PES's suggested interpretation of the contract would produce an absurd result. *See, e.g.*, *Luver Plumbing & Heating, Inc. v. Mo's Plumbing & Heating*, 144 A.D.3d 587, 588 (1st Dep't 2016) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."). Assuming for a moment that the term "products" purported to include "services," the LOL Clause would read:

> [PES's] liability for our [services] is limited to the furnishing of such <u>replacement parts</u>, and . . . we will not be liable for any other expense . . . arising in connection with <u>the sale or use of, or inability to use, our</u> equipment or [services] for any purpose except as herein provided.

(*E.g.*, Dkt. 48-1 at 28 (providing the original text of the LOL Clause as amended here) (emphasis added)). This reading of the contract is nonsensical, and thus confirms that the LOL Clause meant only to cover claims related to the tangible goods for which PES could provide "replacement parts."

Second, Merriam-Webster provides an alternate definition of "product" as "something produced," as in a "commodity." *See* https://www.merriam-webster.com/dictionary/product (last visited Mar. 30, 2022). In turn, "commodity" is defined as an "economic good" such as "an article of commerce especially when delivered" or "a mass-produced unspecialized product." *See* https://www.merriam-webster.com/dictionary/commodity (last visited Mar. 30, 2022). This understanding of the operative term – referring specifically to manufactured goods – better aligns with the contract's plain meaning than PES's suggested alternative. In addition, the fact that the LOL Clause is susceptible to numerous definitions highlights that it lacks sufficiently "clear and unequivocal" terms under New York law to support PES's position. *See Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 352. Interpreting the contract language against the drafter, as the Court

10

must, the LOL Clause has no exculpatory effect on claims arising out of the services that PES provided to Plaintiffs. *ABN Amro Verzekeringen*, 485 F.3d at 100. Thus, Plaintiffs' Motion for Summary Judgement [32] is granted on this count, and Defendant's Motion for Summary Judgment [38] is denied.

**C. Third Affirmative Defense**

PES's Third Affirmative Defense maintains that Plaintiffs' negligence claim is barred by New York's economic loss doctrine. (Dkt. 31-2 at 23). Under this doctrine, plaintiffs generally cannot recover in tort for "purely economic losses caused by the defendant's negligence." *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 378 (S.D.N.Y. 2010); *see also Aretakis v. Caesars Ent.*, No. 16-cv-8751 (KPF), 2018 WL 1069450, at *12 (S.D.N.Y. Feb. 23, 2018) ("[W]here plaintiffs allege primarily economic loss as an injury in a tort claim, 'the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie.' "); *Archstone v. Tocci Bldg. Corp. of N.J., Inc.*, 101 A.D.3d 1059, 1060 (2d Dep't 2012). "It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *See, e.g.*, *Nielsen Media Res., Inc. v. Microsystems Software, Inc.*, No. 99-cv-10876(LAP), 2002 WL 31175223, at *7 (S.D.N.Y. 2002) (citing *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). While the duty forming the basis of a tort claim may be connected to a contract, the alleged legal duty must arise from circumstances "extraneous" to the contract itself. *E.g.*, *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58–59 (2d Cir. 2012); *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 336 (S.D.N.Y. 2015); *Anderson v. Nottingham Vill. Homeowner's Ass'n, Inc.*, 37 A.D.3d 1195, 1197 (3d Dep't 2007).

New York courts have found that contractors may owe a common law duty to perform contracts non-negligently – thereby excepting certain tort claims against them from the economic loss doctrine. *See, e.g.*, *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000) (holding that engineers owed professional duty to complete work with reasonable care). Courts uphold claims for negligent performance of a contract when the parties stand in a professional or fiduciary relationship, and the plaintiff relied on the defendant to supply a specialized service. *See, e.g.*, *id.* at 18 (2d Cir. 2000) ("[I]n claims against professionals, '[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals . . . may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.' ") (citation omitted); *Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 364 (E.D.N.Y. 2013) ("New York law is clear in limiting imposition of a duty, the breach of which can support a claim in tort, to a limited class of professionals and circumstances."); *Hartford Fire Ins. Co. v. Atlantic Handling Sys., LLC*, No. 09-cv-4127 (RRM)(ALC), 2011 WL 4463338, at *6 (E.D.N.Y. Sept. 26, 2011); *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, No. 05-cv-6163T, 2008 WL 163685, at *9–10 (W.D.N.Y. Jan. 16, 2008) (denying motion for summary judgment on professional negligence claim, ruling it was not barred by the economic loss rule); *Anunziatta*, 180 F. Supp. 2d at 358 (ruling that defendant's failure to exercise due care under specialized service contracts gave rise to tort claims akin to professional malpractice). Relevant to the present case, engineering is a recognized professional service that triggers a professional duty of care independent of a contract. *See, e.g.*, *Hydro Invs.*, 227 F.3d at 18 (affirming district court's finding that the doctrine did not apply to defendant engineering firm); *Crown* Castle, 2008 WL 163685, at *10 (denying defendant's motion for summary where plaintiff sought its "professional design, engineering, fabrication and construction

services); *see also Castle Vill. Owners Corp. v. Greater N.Y. Mut. Ins. Co.*, 58 A.D.3d 178, 185 (3d Dep't 2008) ("[A]s a design professional, [defendant] may be subject to tort liability for failure to exercise reasonable care, irrespective of [its] contractual duties.") (internal quotation marks omitted).

Here, the parties dispute whether the economic loss doctrine applies to Plaintiffs' negligence claim. They specifically contest whether PES owed Plaintiffs any duty to perform its services in accordance with a professional standard of care – such that the professional liability exception to the economic loss doctrine would apply. (*E.g.*, Dkt. 39 at 13). Plaintiffs essentially argue that because PES provided "engineering and project management services," this triggered a professional duty of care that PES allegedly failed to satisfy. (*E.g.*, Dkt. 43 at 3). Thus, Plaintiffs maintain that the economic loss doctrine is inapplicable. (*Id.* at 2–4 (citing *Hydro Invs.*, 227 F.3d at 18)). PES counters that the economic loss doctrine bars Plaintiffs' negligence claim because it is not an engineering firm and did not perform engineering services. (Dkt. 39 at 11–12). To that end, Defendant underscores that its subcontractors provided the engineering services at issue, rather than PES itself. (*Id.* at 14). In addition, PES cites Milligan's testimony that none of the services directly provided by PES required professional licensure. (Dkt. 48-1 ¶¶ 4, 7). Whether PES owed an independent duty under these circumstances is a question of law. *Jones*, 81 F. Supp. 3d at 336 (citing *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996)).

The Court finds that PES held itself out as a professional engineering firm, and that this triggered a professional duty of care. *See Hydro Invs.*, 227 F.3d at 13, 16 (affirming damages award on professional malpractice claim were defendant engineers held themselves out as experts in a particular field of engineering even though they "had little [relevant] experience"); *Anunziatta*, 180 F. Supp. 2d at 358 (finding a duty independent of the contract where defendant "held itself out

13

to be a reliable professional, capable of performing the job in a careful, professional manner"); *see also Hartford Fire Ins. Co.*, 2011 WL 4463338, at *6 ("Courts typically uphold claims for negligent performance of a contract when the parties stand in a professional or fiduciary relationship, and the plaintiff relied on the defendant to supply a specialized service."). First, the record shows that Defendant billed itself as a company that could "tap into a wealth of expertise in . . . experienced engineering design and controls." (Dkt. 31-4, Ex. 1 at 39 (cleaned up)). PES's website affirmatively claimed that "**[o]ur engineers** complete a comprehensive study of . . . your desired outcomes before they begin working," and further that its services were performed by "**our specialized engineering staff.**" (*Id.*, Ex. 1 at 40 (emphasis added)). These statements present PES as the entity responsible for providing the services being contracted for. Finally, Milligan continued to sign his emails with the honorific "P.E.," meaning "Professional Engineer," (*see* Dkt. 40-5 at 27–28 (showing emails transmitted by Milligan in May 2019, including his signature block)), despite him no longer holding an active engineering license, (Dkt. 48-1 ¶¶ 6–7). *See also* https://www.nspe.org/resources/licensure (last visited Mar. 30, 2022) ("PE licensure is the engineering profession's highest standard of competence, a symbol of achievement and assurance of quality."). In these ways, PES repeatedly portrayed its business as one that could provide professional engineering services. The fact that it held itself out as such weighs in favor of applying the professional responsibility exception. *Hydro Invs.*, 227 F.3d at 16; *Anunziatta*, 180 F. Supp. 2d at 358.

Next, in his deposition testimony, Milligan explained that PES *does* in fact "supply" engineering services to its customers, albeit through subcontractors. (Dkt. 44-1 at 60:16–61:8 (Milligan testifying further that he "take[s] responsibility for [his] sub[contractor]s")). Milligan also conceded that Plaintiffs "would not expect to receive a separate invoice from a subcontractor"

14

because PES controlled the billing for the services provided, including engineering services. (Dkt. 31-4 at 53:2–6; *see also, e.g.*, Dkt. 48-1 at 120–21 (presenting November 16, 2018 Quotation's charges for "engineering and project management services")). In addition, the plain text of seven of the Quotations issued by PES affirmatively "propose[d] to furnish" engineering and design services to Plaintiffs, among other things. (*See* Dkt. 48-1 at 46 ("[PES] proposes to furnish the following Engineering, Design [and] Silos for the [Rochester Project]."), 54, 65, 79, 102, 116, 152). Plaintiffs accordingly issued several Purchase Orders accepting PES's offer for those same services. (*See id.* at 44 ("[PES] is to furnish the following Engineering, Design [and] Silos for the [Rochester Project]."), 52, 63, 77, 100, 114). Thus, the specialized services at issue here were being managed and performed through PES, and Plaintiffs relied on PES to provide them.

Together, the foregoing facts demonstrate that Plaintiffs engaged PES to provide professional services to them. PES held itself out as a reliable professional in the areas of engineering, design, and project management. PES ultimately <u>did</u> supply professional services to Plaintiffs, and in so doing, this triggered a professional duty of care for PES. *See Anunziatta*, 180 F. Supp. 2d at 358. Under these circumstances, the professional responsibility exception to the economic loss doctrine applies to Plaintiffs' negligence claim. The parties submit no further briefing on this issue. Therefore, Plaintiffs' Motion for Summary Judgement [32] is granted as to PES's Third Affirmative Defense.

## **CONCLUSION**

Plaintiffs' Motion for Summary Judgment [32] is granted, and PES's Motion for Summary Judgment [38] is denied. PES's Motion to Strike and for Leave to File Amended Affidavit [48] is granted in part and denied in part.

_____
Virginia M. Kendall
United States District Judge

Date: March 30, 2022